1
2
3
4
5
6            IN THE UNITED STATES DISTRICT COURT
7               FOR THE DISTRICT OF ARIZONA
8
9   United States of America,            )   CR 04-1659-TUC-RCC (GEE)
                                         )
10          Plaintiff,                   )   **REPORT AND RECOMMENDATION**
                                         )
11  vs.                                  )
                                         )
12                                       )
    DANIEL CORRALES-CUEVAS,              )
13                                       )
            Defendant.                   )
14                                       )
                                         )
15  _____

16      The District Court referred this case to the Magistrate-Judge for hearing on pretrial
17  motions. Daniel Corrales-Cuevas (Corrales) asks this court to suppress all evidence obtained
18  as a result of the "unlawful seizure and subsequent search of the vehicle he was driving".
19  Hearing on the motion to suppress was held on September 21, 2005 . Upon consideration
20  of the evidence presented at the hearing and the arguments of counsel, the Magistrate-Judge
21  recommends the District Court deny the defendant's Motion to Suppress .

22

23  **CHARGE:**

24      It is charged that on or about July 14, 2004, near Tucson, Corrales did knowingly and
25  intentionally possess with intent to distribute approximately 16.1 pounds of a mixture
26  containing a detectable amount of methamphetamine in violation of Title 21, U.S.C., §§
27  841(a)(1) and 841(b)(1)(A)(viii).

28

Copies Distributed

BEARDS, B. ANDERSON, RCC, GEE

**NON-EVIDENTIARY MOTIONS:**

At the hearing on September 21, 2005, defense counsel stated she was withdrawing her motion for grand jury transcripts. She also advised she was satisfied with the government's avowal that it would check to determine if there are reports or statements by agents not previously disclosed. The court reminded government counsel of its continuing duty to provide *Brady* material. Government counsel stated she had made a *Henthorn* request and had not yet received any response. This court advised government counsel to notify defendant if the agencies denied the existence of *Henthorn* material. The court also ordered that the agent-witnesses must preserve any notes relating to the present case, and bring those notes to trial. Government counsel stated she was not aware of the existence of any Rule 404(b) material, but would notify defendant if any was discovered. The government plans to introduce expert testimony as to the value of the methamphetamine and will provide that information to defendant. Defense counsel withdrew her motion regarding the confidential informant.

Lastly, defense counsel stated she was not challenging the voluntariness of any statements made by the defendant following his arrest; nor did she challenge the voluntariness of the defendant's consent to search his truck after he was stopped by law enforcement agents.

**EVIDENCE REGARDING MOTION TO SUPPRESS:**

*Guillermo Metzler*

Metzler is a special agent with Immigration and Customs Enforcement (ICE). During the early morning hours of July 14, 2004, he received a call from a source of information (SOI) advising that a maroon colored Platina, similar to a Nissan Sentra, bearing a specific Mexican license plate number, would enter this country and after clearing the port of entry (POE) would meet with another vehicle containing narcotics, and then escort that vehicle to Tucson. Metzler knew that on two previous occasions (once in 2003, and again in 2004) the SOI had provided information resulting in drug seizures at a POE. Metzler also checked with

the agent who had "handled" the SOI and was advised the SOI had never provided incorrect or false information in the past.

Metzler placed lookouts at the ports of entry, provided the information he had received to the on-duty supervisors at each POE, and organized a surveillance team. At about 12:30 p.m. he received notice the Platina/Nissan had entered the DeConcini POE in Nogales. Metzler asked the port personnel to inspect the vehicle, identify the driver, and otherwise detain the vehicle to give him time to travel to the port and set up surveillance there. Metzler arrived at the POE area, observed the Platina  and was told the driver had declared the car belonged to his aunt and he was coming across to get gas because his aunt could not enter the U.S. The driver stated he would return to Mexico after getting gas and also declared to port personnel that he had no money.

Metzler and other agents followed the maroon Platina as it left the POE and proceeded to a nearby gas station. The maroon vehicle left the gas station and was driven to an AutoZone store where two Hispanic males exited for a short time, returned to the vehicle, and then proceeded onto I-19 northbound. Metzler eventually got about 1000 meters behind the Platina; there were two other surveillance vehicles between the Platina/Nissan and Metzler's vehicle.  At some point Metzler was advised by radio that a blue Ford pickup truck appeared to be travelling in tandem behind the Platina: the vehicles were going about 65 mph, which was slower than the posted speed limit, and they changed lanes "almost simultaneously." Metzler made visual contact with the two vehicles, and he and the other surveilling agents followed the vehicles toward Tucson and throughout that time the vehicles continued to travel in tandem. In the interim, using the license plate number of the Ford pickup, Metzler did a "crossing history" and learned the truck had crossed from Mexico into the U.S. that morning at approximately 10:15 a.m.

At about 2 p.m. the two vehicles left I-19 at Irvington Road and traveled to a AM/PM gas station. Corrales, identified as the driver of the Ford, exited the truck and the two occupants exited the Platina.  All three met and spoke briefly, entered the store, and then exited

- 3 -

1   together. They got back into their respective vehicles, and returned to I-19 and continued
2   northward, continuing to travel in tandem. Metzler instructed agents to pull the vehicles over
3   when it they were past Tucson and it appeared they were traveling further north to Phoenix.
4   Metzler stated he decided to stop the vehicles because he did not have the resources to
5   continue the surveillance to Phoenix.

6       After the two suspect vehicles were stopped, Metzler approached the driver of the Ford
7   pickup, who was identified as the defendant Corrales, identified himself as a law
8   enforcement officer, and asked if he was the owner of the truck. After Corrales stated he was
9   the owner, Metzler advised Corrales that he wanted to ask him questions, but would first
10  have to advise him of his rights. Metzler then read defendant his *Miranda* rights in Spanish
11  from the card he carried and used for such purposes. *See* Exhibit 3. Corrales agreed to
12  answer questions and subsequently admitted he was taking drugs to Phoenix. He stated the
13  drugs were in seat of the truck, and gave Metzler consent to look in the truck. Metzler
14  observed packages behind the seat and then arrested and handcuffed Corrales.

15      Asked to articulate the facts supporting his decision to stop the Ford pickup, Metzler listed
16  the following: information provided by the SOI who had proven reliable in the past,
17  especially the accurate description of the Platina; the Platina driver had stated at the POE he
18  was crossing to get gas in Nogales and would return immediately to Mexic , but then drove
19  on north toward Tucson; the Platina and Ford truck driving in tandem from Nogales; the
20  crossing history he received that the Ford truck had entered the U.S. that morning; and the
21  fact that the occupants of the two vehicles met and conversed at the gas station on Irvington.

22      On cross-examination Metzler admitted the SOI did not tell him  the exact time the
23  Platina/Nissan would enter the U.S. on July 14th or through which POE it would enter. Nor
24  did the SOI provide information regarding:  a description of the load vehicle or where and
25  when it would enter the U.S., where the Platina would meet with the load vehicle, the type
26  or weight of drugs involved, or how the SOI had gotten the information being provided.
27  Metzler stated July 14, 2004, was a Tuesday, and that I-19 is "fairly well traveled" road
28

- 4 -

1   between Nogales and Tucson.  At some point Agent Lepper, in one of the surveillance
2   vehicles, relayed that he thought a Chevy pickup also seemed to be traveling in tandem with
3   the other two vehicles; the Chevy pickup exited I-19 along with the other two and all three
4   vehicles proceeded to the same gas station on Irvington.  Metzler stated it did not appear to
5   him the Chevy truck was traveling in tandem with the Ford and Platina/Nissan and they
6   remained focused on the Ford.  He also stated that other than the Ford truck's association
7   with the Platina/Nissan, he observed nothing suspicious about it.

8

9   ***Eduardo Cota, Jr.***

10   Cota is a special agent with ICE and participated in the surveillance of the Platina/Nissan
11   as it entered the U.S. on July 14, 2004.  Metzler had advised him the maroon Platina/Nissan
12   would enter through a POE, would meet up with another vehicle loaded with narcotics, and
13   both vehicles would then proceed north.  Cota followed the Platina into a gas station in
14   Nogales, saw a passenger exit the Platina/Nissan, and meet with a female in a maroon Grand
15   Marquis while the driver of the Platina stayed in the vehicle using a cell phone.  Neither of
16   the occupants of the Platina/Nissan pumped gas into the Platina.  The Platina/Nissan then left
17   the gas station with  its two occupants and Cota heard over his radio that the vehicle
18   proceeded to the AutoZone in Nogales where the driver and passenger entered the AutoZone
19   store.  He then heard over the radio that the Platina left the AutoZone, proceeded north and
20   entered I-19 northbound. Cota caught up with the Platina/Nissan and about 10 -12 kilometers
21   after the Platina entered I-19 Cota noticed a Ford pickup truck which appeared to be traveling
22   in tandem with the Platina.  Asked why he thought the vehicles were traveling in tandem,
23   Cota replied that both were traveling about 60-65 mph although the speed limit was 75 mph
24   and they were "almost bumper to bumper...not even 10 feet apart", with the Platina in front--
25   and other vehicles were passing them.  During the time–not more than an hour-- the Ford
26   truck and Platina were driving on I-19 before they exited at Irvington Road, Cota and agents
27   in other unmarked cars continued to follow them, with the agents taking turns in pulling up
28

1   and falling back. Cota testified that whenever he made visual contact with the vehicles the
2   Platina was always behind the Ford truck. The agents maintained contact with each other via
3   radio and described the movements of the two vehicles. Cota followed the suspect vehicles
4   after they exited I-19 and when they entered the gas station Cota parked his vehicle so that
5   he could maintain unobstructed visual contact with the suspect vehicles and their occupants.
6   He saw the driver of the Ford truck park at the gas pumps, exit his vehicle, and walk to the
7   front of the store where he met up with the two occupants of the Platina/Nissan and the three
8   entered the store after a brief conversation. Cota identified the defendant Corrales as the
9   driver of the Ford truck.

10      The three suspects exited the store several minutes later. Corrales pumped gas into the
11   truck and the other two got into the Platina. The truck left the gas station first, with the
12   Platina following, and both vehicle proceeded north on I-19. He again got visual contact
13   with the suspect vehicles when they were northbound on I-10 and they seemed to still be
14   traveling in tandem: the Platina was behind the Ford truck and would change lanes whenever
15   the truck did so.

16      At some point Cota stopped the Platina pursuant to a radio message from Metzler. Both
17   the driver and passenger told Cota they were traveling from Nogales to Tucson to buy
18   clothing and that they had stopped for lunch in Green Valley. Cota know this to be a lie as
19   they had been under constant surveillance since entering the U.S. at the POE in Nogales.
20   This information provided by the suspects was conveyed to Metzler, who then advised Cota
21   to release the Platina/Nissan and its occupants.

22

23   ***David C. Lepper***

24      Lepper is a special agent with ICE and was part of the surveillance in the present case. He
25   contemporaneously created a log of the various communications he heard over his radio
26   during the surveillance. *See* Exhibit 2.

27

28

1        Although he did not see the maroon Platina/Nissan when it was in the POE, he did see

2   it in Nogales after it had entered the U.S. shortly after 1 p.m. on July 14th. Lepper first saw

3   the Platina at the AutoZone parking lot. He saw the two occupants exit the vehicle and walk

4   toward the AutoZone entrance. He next saw the Platina northbound on I-19 where the posted

5   speed was 75 mph. He was directly behind the Platina which was traveling at 60-65 mph and

6   other vehicles were passing them. As they approached exit #12 a light colored Ford pickup

7   truck got "right behind" Lepper's vehicle. Lepper slowed down and the Ford pickup passed

8   on the left and got back into the right lane between Lepper and the Platina. Lepper testified

9   he thought it was strange because the Platina and Lepper's vehicle were both traveling below

10   the speed limit. Lepper was the lead surveillance vehicle until the two suspect vehicles left

11   I-19 at the Irvington Road exit. He maintained visual contact with the vehicles during that

12   time and observed that they stayed in close proximity to each other and traveled at about the

13   same speed, usually in the same lane.

14        When the suspect vehicles took the Irvington exit, at about 1411 hours, Lepper also exited

15   but did not follow them to the gas station. Lepper later heard the Ford pickup and the Platina

16   had left the gas station and he saw them pass his location as they drove back to I-19, at about

17   1418 hours. He fell in behind them as they re-entered I-19 continuing north with the Ford

18   truck ahead of the Platina. Later, pursuant to Metzler's instructions Lepper, assisted agent

19   Cota in stopping the Platina/Nissan. He did not speak with the occupants of the Platina,

20   before Metzler directed the Platina and its occupants were to be let go.

21        Lepper testified that at about the same time he became aware of the Ford truck--just

22   outside of Nogales--agent Cota radioed he saw a beige Chevrolet pickup which seemed to

23   be also traveling in tandem with the Platina. Lepper admitted they "weren't sure" which truck

24   was traveling was the suspected load vehicle, and so "kept an observation on both." He

25   stated that although the three vehicles traveled in close proximity to each other, he could not

26   recall the placement of the vehicles all the way to Irvington Road, where the three vehicles

27   exited. Thereafter, Lepper stated he concluded the Chevy truck was not involved as he never

28

saw it again, and heard the radio transmissions indicating the occupants of the Ford truck
and Platina/Nissan had spoken to each other at the AM/PM gas station.

**DISCUSSION:**

Defense counsel argues the agents had no reasonable suspicion to stop the defendant in
this case.

The defendant correctly notes that a search and seizure of a motorist suspected of criminal
activity is analyzed according to the framework set out in *Terry v. Ohio*, 392 U.S. 1, (1968).
For a lawful *Terry* stop, the officer must have "a reasonable suspicion supported by
articulable facts that criminal activity 'may be afoot'." *United States v. Sokolow*, 490 U.S. 1,
7 (1989). In determining whether reasonable suspicion existed to justify an investigatory
stop, a reviewing court is required to "look at the totality of the circumstances of each case
to see whether the detaining officer ha[d] a particularized and objective basis for suspecting
legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal punctuation
removed). This process allows officers to draw on their own experience and specialized
training to make inferences from and deductions about the cumulative information available
to them. *Id.*

In the present case Metzler initially received information from a confidential informant
that a maroon colored Platina vehicle bearing a particular Mexican license plate would cross
from Mexico into the United States on July 14th and after clearing the POE would meet with
another vehicle containing narcotics and then escort that vehicle to Tucson. Metzler testified
the informant had twice provided information to law enforcement which had resulted in the
seizure of narcotics at a POE, and had never provided incorrect or false information in the
past. Because the informant did not specify the POE through which the Platina would enter,
Metzler arranged for agents to watch the ports of entry at Nogales and Douglas, and at some
point on that date the vehicle described by the informant--same make, color, and license plate
number--did, in fact, enter the U.S. through the POE in Nogales. Of course, the mere entry

- 8 -

1   of the Platina into this country would have been innocuous except for the specifically

2   descriptive information previously provided by the informant. The entry of the Platina/Nissan

3   not only corroborated that piece of data provided by the informant, but certainly led the

4   agents to believe the informant's tip that it would be involved in drug trafficking would also

5   prove to be true–as had been the case in prior instances involving this informant..

6       Once the Platina/Nissan entered this country agents continued their surveillance. Metzler

7   noted that contrary to information provided by the Platina's driver at the POE, instead of

8   purchasing gas and returning to Mexico he proceeded north from Nogales towards Tucson,

9   which corroborated information provided by the informant. At some point the agents

10  concluded the Platina was traveling in tandem with at least one of two noted pickups..

11  Although all three vehicles exited I-19 at the same point close to Tucson, the agents'

12  continued surveillance led them to focus on the Ford truck as the possibly drug laden vehicle

13  when its driver was seen speaking with the occupants of the Platina at the AM/PM gas station

14  and when both vehicles then continued north on I-10, again traveling in tandem.

15      An anonymous tip, if significant details are corroborated by law enforcement, may

16  constitute founded suspicion authorizing a *Terry* stop. *See Alabama v. White,* 496 U.S. 325,

17  331-32 (1990).  This court concludes that given the information provided by an individual

18  who had twice previously given reliable information regarding drug trafficking activities, and

19  considering the agents' subsequent fact gathering and surveillance which corroborated the

20  informant's tip, agent Metzler had sufficient information to establish reasonable suspicion

21  to justify his decision to stop the Ford truck.

22

23

24  **RECOMMENDATION;**

25      In view of the foregoing it is recommended that, after its independent review of the record,

26  the District Court **DENY** the Motion to Suppress. This Report and recommendation is being

27  faxed to all counsel on this date. Each counsel may serve and file written objections within

28

1  10 days. If objections are not timely filed, the party's right to de novo review may be waived.

2  If objections are filed, they should be directed to the District Court by omitting the

3  magistrate's initials: CR-04-1659-TUC-RCC.

4      The Clerk of the Court is directed to send a copy of this Report and Recommendation to

5  all counsel.

9      DATED this 19th day of December, 2005.

Glenda E. Edmonds
United States Magistrate Judge



# DECLARATION DE DERECHOS

Antes de hacerle algunas preguntas, usted tiene que entender;

D.C.C. —usted tiene el derecho de permanecer callado.

D.C.C. -cualquier cosa que usted diga, se puede usar en su contra en la corte.

D.C.C -usted tiene el derecho de consultar con un abogado, antes de hacerle algunas preguntas, y tener dicho abogado presente durante el interrogatorio.

D.C.C -si usted no puede pagar para los servicios de un abogado, uno sera nombrado para usted, antes de cualquier interrogatorio, si usted desea.

Entiende usted?   Si

Esta dispuesto a contestar algunas preguntas?   Si

_Daniel Corrales Cuevas 14-Julio-_

_7-14-04_
_1546_          **Firma y Fecha**
                14-Julio — 04
_____         _____
SA Guillermo R. Metzler, U.S. Immigration and     Fecha y
Customs Enforcement          Hora
                    7/14/04

_____              3:43 P.M.
Testigo                  _____
                           Fecha



ll

0482



**DHS/ICE**
**OFFICE OF INVESTIGATIONS**
**SURVEILLANCE REPORT**
1420 N. Mariposa Rd
Nogales, AZ, 85621 (520 377-3100
Fax (520) 377-3108

| Date: 07/14/2004 | | | | Case No.: | | |
|---|---|---|---|---|---|---|
| Day: Wednesday | | | | Prepared By: SA David Lepper | | |
| Subject Surveilled: | | | | | | |
| Address Surveilled: | | | | | | |
| City: Nogales | | | | State: AZ | | |
| VEHICLE | Year: | Make/Model: Nissan (Similar to Sentra) | | Color: Maroon | License No.: VTC-8695 | |
| VEHICLE | Year: 1980's | Make/Model: Ford Pick-up | | Color: Beige/White | License No.: UM45746 | |

## SURVEILLANCE TEAM

| A-2142 | A-2128 | | | | |
|---|---|---|---|---|---|
| A-2132 | | | | | |
| A-2144 | | | | | |
| A-2124 | | | | | |
| A-2112 | | | | | |
| A-2115 | | | | | |

| Date | Time | Unit # | Observations |
|---|---|---|---|
| 12:51 | 07/14/04 | A2142 | Being inspected @ Grand Ave POE, Nogales AZ - 1 H/M driver buzz haircut, light gray shirt over khaki pants. |
| 07/14/04 | 13:00 | A2112 | Depart Grand Ave POE - parks @ shell station on Crawford - speaks w/ two males while getting gas / Talks to a female in a maroon Grand Marquis. |
| 07/14/04 | 13:08 | A2112 | driver makes a cellular telephone call. |
| 07/14/04 | 13:10 | A2112 | departs shell station - stops @ Auto Zone parking lot on Grand Ave (A2115/A2124) - Two H/M exit vehicle and |

EXHIBIT ADMITTED 2 CR04 1659 SURVEILLANCE NOTES

EXHIBIT # CR04 1659

[ ] Check box if additional information is on reverse side

| Date | Time | Unit # | Observations |
|------|------|--------|--------------|
| | | | walk (S) on Grand Ave towards entrance to Auto Zone. |
| | | | H/M #1 Gray T-shirt / blue jeans / short black hair / 24-27 YOA / |
| | | | H/M #2 White shirt / black pants / black hair / 19-24 YOA |
| 07/14/04 | 13:15 | A-2115 | Same H/M #1 and #2 return to vehicle. Depart and |
| | | | travel (S) on Arroyo and (W) onto I-19 |
| 07/14/04 | 13:20 | A-2124 | traveling (N) on I-19, lane #2, speed 60-65, observe |
| | | | older model Ford pick-up MX plate, light in color - |
| | | | Beige / White, w/ 1 H/M occupant driving behind |
| | | | Nissan @ approx. same speed just (S) of exit 12 |
| | | | I-19 MX plate UM45746. |
| | | A-2112 | Also observes a beige Chevrolet pick-up that appears |
| | | | to be traveling in tandem w/ Nissan and Ford. |
| 07/14/04 | | A-2124 | All three vehicles exit I-19 @ Irvington and travel |
| | | | eastbound. Chevrolet pickup MX plate UM97811 |
| | | | occupied by two H/M. All stop @ ARCO gas station |
| | | | on Irvington / 12th Ave. Driver of Ford approaches |
| | | | driver of Nissan. (A-2112) |
| 07/14/04 | 14:18 | A-2011 | Ford and Nissan travel (W) on Irvington and enter |
| | | | (N) I-19. Traveling in tandem and enter (E) I-10 |
| 07/14/04 | 14:33 | A-2133 | Stop Nissan on I-10 (W) just (S) of Cortaro Rd exit. |
| | | | Nissan occupied by H/M #1 and #2 that were observed |
| | | | in Nogales, AZ. (Present - A-2133, A-2124, A-2112) |
| | | | * other A-2100 units stopped Ford just further (S) on I-10. |
| 07/14/04 | 15:00 | A-2133 | Clear of skip - Nissan and occupants released. |
| | | | |
| | | | |

UM97811 Chev. Tan PK (x2)          Suppose to go get gas

07/14/04  12:47 pm                 UM45746 Ford PK (x1)

Present: 42, 44, 24, 12, 32, 28 (B) w/15,
Vehicle: Maroon Nissan Sentra  VTC-8695  (40)  1 H/M driver, buzz
        hair, light/gray shirt over khaki pants. (Possible heat vehicle)

12:51 PM - Vehicle inspected @ Grand Ave POE, Nogales, AZ

13:00 PM - (12) depart to Shell station - met 2 males while getting gas.
            Talking to female in maroon Grand Marquis
13:08 PM - ~~departing Shell~~ 2 H/M Talking on Nextel in Shell parking lot

13:10 PM - departing Shell - parked @ Auto Zone lot - 2 H/M exits
vehicle walking (S) towards entrance of Auto Zone
H/M #1 - Gang T-shirt / blue jeans / short black hair / 24-27 YOA
H/M #2 - White shirt / black pants / Black hair / 19-24 YOA

13:15 - 2 H/M's return to vehicle, depart (S) on Arroyo
        (N) I-19

14:11 - Vehicle exited I-19 @ Irvington - east to Arco gas
station on 12th. Was traveling in tandem w/ Ford
MX UM45746 and Chevrolet MX UM97811 (x2)
(1 H/M). All stopped @ gas station. Driver of
Ford approaches driver of maroon vehicle. On N.E.
corner

14:18  (N) I-19  Ford / Nissan

14:33 - Stop Nissan before Cortaro Rd  I-10

15:00 - Clear of stop / Released

Driver : Juan Miguel Rocha Lugo
DOB     5/26/81
B1/B2 visa/BCC : NGLO0000 45201
               MEX


Pax : Chrishan Michael PORTILLO Lopez
             6/17/87
B1/B2 visa/bcc# NGL 000053431
             MEX


VTS 8695
Nissan Plathra (MAK)

Blanca Rosa Rocha Barrera
Andador 136 Col Fovissste
      Nogales So MX

VIN#3N1JH01573L055485